**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| EMERSON ELECTRIC CO., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> JACOB CEASAR, ) <br> ) <br> Serve: 12511 Ivy Run Ln ) <br>        Pearland, Texas 77584 ) | Case No. <br><br> JURY TRIAL DEMANDED |

**VERIFIED COMPLAINT**

1. Plaintiff Emerson Electric Co. ("Emerson") brings this action against Defendant Jacob Ceasar ("Ceasar" or "Defendant") to enforce non-competition and confidentiality agreements, to enjoin the actual or threatened misappropriation of trade secrets, and to sue for breach of contract and unfair competition.

2. Ceasar is a former Director of North America Project Pursuit with Emerson's Measurement Solutions Group. His employer was Micro Motion, Inc., an indirect wholly owned subsidiary of Emerson. Ceasar recently resigned from his senior leadership position within Emerson to take a similar position at Endress+Hauser. Endress+Hauser is Emerson's direct competitor. Ceasar took his new position with Endress+Hauser despite being fully aware that he had signed a non-competition agreement with Emerson in exchange for the grant of stock units from Emerson. *See* Ex. 1, Restricted Stock Units Program Award Agreement.

3. Moreover, Ceasar was privy to highly sensitive, confidential information regarding Emerson's global business.

4. Ceasar should be enjoined from working for Endress+Hauser in violation of his post-employment obligations to Emerson.

## Parties

5. Emerson is a corporation organized, existing, and in good standing under the laws of the State of Missouri, with its principal place of business at 8027 Forsyth Blvd. St. Louis, Missouri 63105.

6. Ceasar is an individual who, upon information and belief, is a citizen of Texas. Ceasar currently resides in Texas.

## Nature of the Case

7. At the time he resigned, Ceasar was employed by Emerson through its wholly owned subsidiary Micro Motion, Inc. For purposes of this Complaint, Emerson will refer to itself and Micro Motion, Inc. collectively as "Emerson."

8. Emerson's business includes manufacturing, process and software automation, supplying and servicing products, project management, and customer and business development across industrial markets and global locations.

9. Ceasar became an employee of Emerson in 2014.

10. Ceasar most recently held the position of Director of North America Project Pursuit, and was located in Houston, Texas.

11. While at Emerson, Ceasar worked on the selling of measurement instrumentation to companies in the following industries: LNG (liquified natural gas), chemical, paper processing, refining, semiconductors and data centers, upstream (i.e. the exploration, drilling, and extraction of oil), brownfield decarbonization, metals and mining, alternative fuel, hydrogen, life sciences, and renewable plastics.

12. In his role as Director of North America Project Pursuit, Ceasar's responsibilities included: driving profitable project growth for Measurement Solutions and taking a leadership role

in establishing pricing, quoting strategy, and proposal process for top tier projects in North America; understanding and communicating the customers business strategies around projects to the rest of the organization; preparing a detailed business plan to drive project growth, price, and industry diversification in North America; establishing and maintaining high-level contact relationships on Measurement Solution's behalf within critical EPCs in North America,; developing and maintaining a Measurement Solutions North America top project's list; providing monthly updates to appropriate Measurement Solutions and World Area leadership; coordinating multinational projects and customer pursuits with other world areas and business units and facilitate assignment of Measurement Solutions primary lead on all select global projects;  and working with strategic accounts teams, field sales, and sales leadership to identify, prioritize and position Measurement Solutions earlier in the project cycle to achieve maximum company content.

13. In Ceasar's role with Emerson, he was exposed to business strategies and plans that apply worldwide, including new product development and research. As such, he held significant influence over Emerson's key clients, customers, employees, and industry trade organizations.

14. Ceasar also had direct and intimate access to, and use of, confidential information belonging to Emerson. Without limitation, this information included customer information and lists, pricing information and pricing strategy, profit and loss information, technical and project information, marketing and sales information, supplier information, and staffing information (including remuneration).

15. Ceasar sent his resignation to Emerson on July 28, 2025 and stated his last working day would be August 8, 2025.

16. Ceasar declined to inform Emerson of his plans and of whether he was going to work for a competitor.

17. On July 29, 2025, Emerson sent a letter to Ceasar in which it reminded him of his post-employment obligations to Emerson and of his non-compete obligations under the Restricted Stock Units Program Award Agreement. *See* Ex. 1.

18. On July 30, 2025, Emerson emailed the Restricted Stock Units Program Award Agreement to Ceasar.

19. In August, 2025, Emerson learned that Ceasar had joined Endress+Hauser as an Business Development Manager of LNG & Marine at its facility in Pearland. Endress+Hauser is a direct competitor of Emerson, and LNG is one of the industries that Ceasar served for Emerson. Pearland is roughly 15 miles from Ceasar's former Emerson work location in Houston, Texas.

20. Ceasar's employment at Endress+Hauser puts Ceasar in direct violation of the non-competition agreement he entered into with Emerson.

## Emerson and Endress+Hauser are Direct Competitors

21. Emerson is a direct competitor to Endress+Hauser.

22. Endress+Hauser offers measurement instrumentation products that directly compete with products offered by Emerson's Measurement Solutions business unit and Micro Motion, Inc.

23. At Emerson, Ceasar was part of the Measurement Solutions business unit and thus worked on products that directly compete with products made and sold by Endress+Hauser.

24. Emerson competes with Endress+Hauser globally, including in North America, Asia, the Middle East and Africa, and Europe.

## Ceasar's Changing Role with Endress+Hauser

25. On August 20, 2025, Emerson sent a cease-and-desist letter to Ceasar and Endress+Hauser.

4

26. In response, an attorney for Endress+Hauser informed Emerson that Ceasar had informed Endress+Hauser of his post-employment obligations to Emerson. The attorney for Endress+Hauser asserted the company had hired Ceasar for a LNG role, but upon learning of his obligations to Emerson, had reassigned him to a role serving the semiconductor and data center industry.

27. On August 25, 2025, Endress+Hauser provided Emerson with a job description of Ceasar's current role with Endress+Hauser. The job description states that Ceasar's role with Endress+Hauser is to "drive growth initiatives by expanding Endress+Hauser's presence in the semiconductors and data centers markets. This role focuses on strengthening key customer relationships, specifically with Meta, Prime Controls, and Micron ….." Ex. 2.

28. Apparently Endress+Hauser's position is that it had been led to believe that Ceasar would not be breaching his non-competition obligations to Emerson if he was working in a role that served the semiconductor and data center industry.

29. On the other hand, the Endress+Hauser job description states that Endress+Hauser expects the person performing the role to have "7+ years of relevant experience in the semiconductor and/or data center market, or 10+ years of industry experience in business development, sales, or a related role within the semiconductor and/or data center market."

30. Upon information and belief, Endress+Hauser knew that Mr. Ceasar did, in fact, possess "relevant experience in the semiconductor and/or data center market" because he worked in the semiconductor and data center market for Emerson, as Emerson alleges.

### Ceasar's Agreement with Emerson

A. The Award Agreement

31. As a senior executive, Ceasar chose to participate in Emerson's Restricted Stock Units Program.

32. On November 4, 2024, Emerson awarded Ceasar 227 Restricted Stock Units ("RSUs").

33. On December 12, 2024, Ceasar accepted and entered into the Restricted Stock Units Program Award Agreement (hereinafter, the "Award Agreement") with Emerson. Ex. 1.

34. The Award Agreement sets forth the consideration given by Ceasar to Emerson in exchange for being awarded the RSUs.

35. The Award Agreement provides: "Pursuant to the terms set forth herein and for good and valuable consideration of the foregoing and as a condition of this award, you agree to the following":

> 2. That during your employment by Emerson Electric Co. or any of its divisions, subsidiaries or affiliates (collectively, "Emerson"), and for a period of one (1) year immediately after your employment with Emerson ends for any reason, including by reason of divestiture or spin-off, you will not directly or indirectly, regardless of whether any payment has been made to you under the Program, (a) compete against, or enter the employ of or assist any person, firm, corporation or other entity in a business that competes against any business of Emerson in which you were at any time employed, (b) compete against any such Emerson business by soliciting or pursuing its customers, or (c) solicit or hire any Emerson employees. Emerson shall be entitled to all rights and remedies available at law or equity for any breach or threatened breach of this Agreement, including a cancellation of this Award and any other outstanding equity awards and/or the return of all shares (including any cash payment in lieu of shares) issued under this Program or any prior program under the Plan, damages, and injunctive relief.
>
> 3. The Program benefits Emerson employees who have access to Emerson's confidential and proprietary business plans and strategies and Emerson's confidential and propriety business methods and customer relationships and preferences. You therefore acknowledge that by virtue of your position and responsibilities within Emerson, you have access to Emerson's highly confidential business plans and

strategies, and which strategies will be implemented in the future. You also acknowledge that by virtue of your position and responsibilities within Emerson that you have access to Emerson's confidential and trade secret methods for conducting its business, as well as confidential information regarding customers and customer preferences. You further acknowledge that competitors of Emerson would obtain unfair insights into Emerson's plans, strategies, and confidential business methods should they obtain access to Emerson's plans, strategies, customer relationships, preferences, and business methodologies and that Emerson would be irreparably harmed should a competitor obtain access to this information. You further acknowledge that Emerson is a global company, competing with other global companies, regarding its products and services and customer relationships and preferences. You agree that you will not directly or indirectly for any purpose other than performance of your duties for Emerson disclose or cause the disclosure of Emerson's trade secrets or confidential and proprietary information[.]

4. This Award is conditioned upon your compliance with this Agreement and all practices and policies under Emerson's Ethics and Compliance Program, including our Code of Conduct and Code of Ethics, both incorporated by reference as if fully set forth herein, and that your actions will reflect Emerson's Core Value of Integrity. Any violation of our Ethics and Compliance Program will result in the forfeiture of this Award or the repayment of any amounts paid under this Award.

5. This Award and Agreement are governed by Missouri law, without regard to any conflicts of law principles thereof, and you consent that jurisdiction to resolve any disputes rests exclusively in the courts in the U.S. District Court for the Eastern District of Missouri or the Circuit Court for the County of St. Louis, and further consent to accept service of process in those courts should a dispute arise.

Ex. 1.

36. The Award Agreement further states, in bold font: "You acknowledge and agree that you have read and understand the terms of this Agreement, the Plan and the Offering Circular for the Plan, and any supplements thereto, and accept this Award conditioned upon the terms set forth therein." *Id.*

7

37. In order to protect its trade secrets and enforce the Award Agreement with Ceasar, Emerson is forced to bring this action to enjoin Ceasar immediately, as well as for other damages and relief.

## Jurisdiction and Venue

38. Jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1332 because the citizenship of the parties is diverse and the amount in controversy exceeds $75,000.

39. For diversity jurisdiction purposes, Emerson is a citizen of Missouri and Ceasar is a citizen of Texas. Therefore, there is complete diversity of citizenship between the parties.

40. The amount in controversy is in excess of $75,000 in that (a) Defendant has caused or, if not enjoined, will cause Emerson to suffer lost profits in excess of $75,000.

41. This Court also has pendant jurisdiction and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 in that all of Emerson's claims against Defendant are so related that they form part of the same case or controversy under Article III of the United States Constitution.

42. This Court has specific personal jurisdiction over Ceasar pursuant to R.S.Mo. § 506.500.1(1) & (2) because Ceasar entered into the Award Agreement with Emerson, a corporation with its principal place of business in Missouri; expressly agreed to jurisdiction in this Court in the Award Agreement; was employed by Emerson and/or its wholly owned indirect subsidiary; and thereby transacted business within Missouri.

43. On August 20, 2025, counsel for Emerson sent Ceasar's RSU Agreement to both Ceasar and the general counsel for Endress+Hauser in the United States, and demanded that Ceasar and Endress+Hauser cease and desist from activities that violate the RSU.

44. Endress+Hauser is aware of Ceasar's non-compete obligations to Emerson in the Award Agreement and is further aware that Ceasar will violate those non-compete obligations if Ceasar works for Endress+Hauser.

45. Endress+Hauser is aware of Ceasar's obligations to Emerson and its wholly owned subsidiary to preserve the confidentiality of sensitive business information, customer lists and other trade secrets.

46. Endress+Hauser is aware that Ceasar will inevitably disclose confidential and sensitive business information, customer lists and other trade secrets, if Ceasar is allowed to work for Endress+Hauser.

47. Endress+Hauser is aware that if he is not enjoined, Ceasar will breach his non-compete obligations to Emerson.

48. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) & (3) because the events giving rise to the claims in this action occurred in substantial part in this District (where Ceasar transacted business by accepting the Award Agreement), because Ceasar expressly consented to venue in this District in the Award Agreement, and because the harm and threatened harm has occurred and will continue to occur here if Defendant is not enjoined.

### COUNT I: BREACH OF CONTRACT

49. Emerson incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

50. A valid contract exists between Emerson and Ceasar in the form of the Restricted Stock Units Program Award Agreement. Ex. 1.

51. The contract was, and is, supported by sufficient consideration as evidenced by (1) Emerson's awarding of RSUs to Ceasar, (2) the statements in the Agreement that the purpose of

the non-compete clause was to protect "Emerson's confidential and trade secret methods for conducting its business, as well as confidential information regarding customers and customer preferences", (3) Ceasar's express acknowledgement of the restrictions, of the purpose of the restrictions, and of the fact that "by virtue of [his] position and responsibilities within Emerson, [he] ha[d] access to Emerson's highly confidential business plans and strategies", and (4) the identification of the interests of Emerson that the non-compete clause is necessary to protect.

52. Despite Emerson's performance and willingness to perform in compliance with the Award Agreement, Ceasar breached the contract.

53. In the Award Agreement, Ceasar agreed that for a period of one (1) year following the termination of his employment with Emerson or any of its divisions, subsidiaries or affiliates, he would not: "(a) compete against, or enter the employ of or assist any person, firm, corporation or other entity in a business that competes against any business of Emerson in which you were at any time employed, (b) compete against any such Emerson business by soliciting or pursuing its customers, or (c) solicit or hire any Emerson employees." Ex 1, ¶ 2.

54. Emerson's award of RSUs to Ceasar under the Award Agreement was "conditioned upon your compliance with this Agreement and all practices and policies under Emerson's Ethics and Compliance Program, including our Code of Conduct and Code of Ethics, both incorporated by reference as if fully set forth herein, and that your actions will reflect Emerson's Core Value of Integrity." Ex. 1, ¶ 4.

55. Ceasar breached the Award Agreement by, among other things, (1) agreeing to employment in some capacity with a direct competitor, Endress+Hauser; (2) upon information and belief, sharing confidential and proprietary information with Endress+Hauser and/or using such

information on Endress+Hauser's behalf; and (3) diverting or attempting to divert Emerson's customers to Endress+Hauser.

56. While the full extent of Ceasar's actions and the damages caused thereby are presently unknown, Ceasar's breach of the Award Agreement has caused and will continue to cause damages to Emerson, including without limitation jeopardy to and/or loss of Emerson's existing and future business relationships and contracts with its customers, lost profits, loss of goodwill, loss of customer contacts, unfair competition, loss of confidential business information, damage to or loss of Emerson's reputation, and loss of competitive advantage.

57. Accordingly, injunctive and other relief should be issued forthwith to enjoin Ceasar's conduct, hold Ceasar accountable for the promises and agreements he made, and award relief to Emerson to remedy Ceasar's multiple breaches of the Agreement.

## COUNT II: VIOLATION OF MISSOURI UNIFORM TRADE SECRETS ACT

58. Emerson incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

59. The Missouri Uniform Trade Secrets Act, Mo. Rev. Stat. § 417.450 et seq. ("MUTSA") provides that an owner of a trade secret may bring a civil action to prevent any actual or threatened misappropriation of a trade secret.

60. Ceasar signed the Award Agreement in which he agreed to comply with Emerson's Code of Conduct. Ex. 1, ¶ 4.

61. Emerson's Code of Conduct states, in pertinent part:

> Emerson employees, officers, and directors should maintain the confidentiality of all information entrusted to them by Emerson or its customers or business partners, except when disclosure is authorized or legally mandated. Confidential information includes all non-public information that might be of use to competitors, or harmful to the company or its customers, if disclosed. Emerson

11

protects its intellectual property through patents, copyrights, trade secrets, and contractual confidentiality agreements. Employees cannot take or give away Emerson's intellectual property without authorization.

62. For the reasons set forth above, Defendant misappropriated and may continue to appropriate Emerson's trade secrets in violation of MUTSA.

63. Accordingly, Emerson brings this claim to prevent the actual or threatened misappropriation of its trade secrets by Defendant, as specifically provided under MUTSA.

64. Emerson takes reasonable steps to maintain the secrecy of its trade secrets, such as restricting access to information to only certain employees and requiring logins and passwords on its Information Technology systems.

65. Emerson requests a temporary restraining order, preliminary injunction, and permanent injunction under Mo. Rev. Stat. § 417.455 to prevent any actual or threatened misappropriation of its trade secrets.

66. Emerson also requests an award against Defendant to the maximum extent permitted under Mo. Rev. Stat. § 417.457.

## COUNT III: UNFAIR COMPETITION

67. Emerson incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

68. Defendant's actions as specified above constitute unfair competition with Emerson by reason of Defendant's use and disclosure of Emerson's trade secrets and other confidential information.

69. As a direct and proximate result of Defendant's actions, Emerson has been damaged and will continue to be damaged.

70. Defendant's conduct was willful, intentional and outrageous, evidencing evil motive or reckless indifference to the rights of others.

## COUNT IV: INJUNCTIVE RELIEF

71. Emerson incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

72. Ceasar has breached, and continues to breach, the Award Agreement, including without limitation by working for a direct competitor of Emerson and by threatening to use or actually using Emerson's trade secrets and other confidential and proprietary information for his employment at Endress+Hauser, all of which directly violates the Award Agreement and the Code of Conduct.

73. Emerson cannot fully and adequately determine the extent and effect of Defendant's actions at this time, which remain ongoing and unlawful.

74. Allowing Defendant to violate his contractual agreement, applicable law, or both, has resulted and will continue to result in irreparable harm to Emerson, including without limitation loss of customers, loss of goodwill, loss of customer contacts, unfair competition, loss of confidential business information, loss of trade secrets, loss of reputation, loss of contracts with customers, and loss of competitive advantage.

75. Emerson will therefore suffer irreparable injury and harm from Defendant's violations should injunctive relief not issue in favor of Emerson and against Defendant.

76. At this time, it is impossible for Emerson to calculate the damage that has resulted, and will continue to result, from Defendant's violations. It is equally impossible to calculate the resulting damages to Emerson's loss of tangible or intangible property, loss of customers, loss of good will, loss of customer contacts, unfair competition, loss of confidential business information,

loss of trade secrets, loss of reputation, loss of contracts with customers, and loss of competitive advantage.

77. Any harm Defendant may allegedly incur as a result of the requested injunctive relief is overwhelmingly outweighed by the harm to Emerson should the relief not issue, a situation that Defendant created himself.

78. Injunctive relief is not against the public interest; it would merely enforce Ceasar's contractual obligations and Defendant's obligations under the law.

79. The requested injunctive relief, as detailed in Emerson's prayer for relief below, must be granted to avoid any immediate irreparable injury, loss, or damage to Emerson.

80. The requested injunctive relief serves to preserve the status quo pending a determination of the controversy between the parties.

81. Emerson has no adequate remedy at law concerning its claims set forth in this Count.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Emerson Electric Co. prays for judgment against Defendant Jacob Ceasar as follows:

(a) Monetary damages in an amount unknown at this time and to be proven at trial as a result of Defendant's breach of contract, tortious interference with contract, unfair competition, and violation(s) of the Missouri Uniform Trade Secrets Act;

(b) Entering a temporary restraining order, preliminary injunction, and permanent injunction enjoining and restraining Defendant and his agents and those acting in concert with him:

    (i) During the period of one (1) year following the date of termination of Ceasar's employment with Emerson, from acting, directly or indirectly (whether as

an owner, employee, consultant, independent contractor or any other role) in any capacity with a company that directly competes with Emerson, including Endress+Hauser, by selling or supporting the sale of measurement instrumentation in the following industries: LNG (liquified natural gas), chemical, paper processing, refining, semiconductors and data centers, upstream (i.e. the exploration, drilling, and extraction of oil), brownfield decarbonization, metals and mining, alternative fuel, hydrogen, life sciences, and renewable plastics; and

(ii)    With respect to confidential and proprietary information (including trade secrets) of Emerson, from disclosing, using, or providing any such documents, information, or trade secrets, directly or indirectly, to anyone, except for the return of such documents, information, or trade secrets directly to Emerson or its attorneys;

(iii)   During the period of one (1) year following the date of termination of Ceasar's employment with Emerson, calling upon, soliciting, diverting, attempting to call upon, solicit, or divert (or assist in any of the foregoing), or accept business from/do business with any customer/potential customer of Emerson that was a customer/potential customer that Ceasar serviced during Ceasar's employment with Emerson.

(c)     Award Emerson its attorneys' fees, costs and expenses incurred or expended;

(d)     Award pre- and post-judgment interest at the maximum rate permitted by law; and

(e)     Such other and further relief as the Court deems just and proper.

Dated: August 29, 2025

Respectfully submitted,

**DOWD BENNETT LLP**

By: /s/ *John D. Comerford*
James F. Bennett #46826MO
John D. Comerford #60164MO
James B. Martin #70219MO
7676 Forsyth Blvd., Suite 1900
St. Louis, Missouri 63105
(314) 889-7300 (phone)
(314) 863-2111 (facsimile)
jbennett@dowdbennett.com
jcomerford@dowdbennett.com
jbmartin@dowdbennett.com

*Attorneys for Plaintiff Emerson Electric Co.*

## CERTIFICATE OF SERVICE

I hereby certify that on August 29, 2025 the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system.

The foregoing was also served via email on the Defendant at the following email address: ceasarjacob@yahoo.com

The foregoing was also served via email on counsel for Defendant at the following email address: bruse@jgl-law.com

/s/ *John D. Comerford*

## VERIFICATION

I, Laura Schafer, declare:

1. I am VP North America for Measurement Solutions, a business unit of Emerson Electric Co. I am employed by an indirect wholly owned subsidiary of Emerson.

2. I verify that the foregoing Verified Complaint for and on behalf of Emerson Electric Co. was duly prepared under my direction with the assistance of counsel; that the facts stated therein have been assembled by authorized employees and counsel for Emerson and its direct and indirect subsidiaries; and that the allegations therein are true and correct to the best of my knowledge, information, and belief.

3. I declare under penalty of perjury that the foregoing is true and correct.

_____

Executed in CHANHASSEN, MN   on AUGUST 29, 2025.