**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| EMERSON ELECTRIC CO., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:25-CV-1312 HEA |
| | ) | |
| JACOB CEASAR, | ) | |
| | ) | |
| Defendant. | ) | |

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND PRELIMINARY INJUNCTION ORDER

This matter is before the Court on Plaintiff Emerson Electric Co.'s ("Emerson") Motion for Preliminary Injunction against Defendant Jacob Ceasar. (ECF No. 32). The case arises out of the alleged breach of a non-competition and non-disclosure agreement between Emerson and its former employee, Defendant Ceasar, who left Emerson to work for its competitor, Endress+Hauser. Emerson's Complaint asserts claims against Defendant Ceasar for breach of contract, violations of the Missouri Uniform Trade Secrets Act ("MUTSA"), Mo. Rev. Stat. §§ 417.450, *et seq.*, and common law unfair competition. Emerson moves for the entry of a preliminary injunction as to its claims for breach of contract and violations of MUTSA.

When Emerson initially filed suit against Defendant Ceasar, it moved for the entry of a temporary restraining order, which the Court granted on October 2, 2025.

(ECF No. 29). Emerson now moves for a preliminary injunction. The parties conducted expedited and limited discovery, and on October 15, 2025, the Court held an evidentiary hearing. After consideration of the evidence and the parties' arguments, the Court will grant in part Emerson's Motion for Preliminary Injunction against Defendant Ceasar.

## I.    *Findings of Fact*

From 2014 through July 2025, Defendant Ceasar was an employee of Micro Motion, Inc., an indirect, wholly owned subsidiary of Emerson. Defendant Ceasar initially held a sales role serving as an Account Manager, and in his last three years with the company he served as Director of North America Project Pursuit with Emerson's Measurement Solutions Group in Houston, Texas. Emerson is a global technology, software, and engineering company, and its business includes manufacturing, process and software automation, supplying and servicing products, project management, and customer and business development across industrial markets and global locations.

During his tenure at Emerson, Defendant Ceasar worked on the selling of measurement instrumentation to companies in the following industries: liquified natural gas ("LNG"), chemical, paper processing, refining, semiconductors, upstream (i.e., the exploration, drilling, and extraction of oil), brownfield decarbonization, metals and mining, alternative fuel, hydrogen, life sciences, and

renewable plastics.   As Director of North America Project Pursuit, Defendant Ceasar's responsibilities included driving profitable growth for Measurement Solutions and working with a team to establish pricing, quoting strategy, and the proposal process for projects in North America; understanding and communication the customers business strategies around projects in the LNG industry to the rest of the organization; having contact relationships with Engineering Procurement and Construction ("EPC") in North America; contributing to and maintaining a Measurement Solutions North America top project's list; and working with strategic accounts teams, field sales, and sales leadership to identify, prioritize, and position Measurement Solutions in the project cycle.  In his role as Director of North America Project Pursuit, Defendant Ceasar had access to customer information and lists, pricing information, technical and project information from customers, and marketing and sales information.  He also developed and maintained a top projects list and provided monthly leadership updates within Emerson Measurement Solutions.  While he maintained the list, Defendant Ceasar did not work on all the projects on the list, and it is unclear from the record the extent to which Defendant Ceasar had knowledge about the projects on the list.

Quotes for projects are hundreds of pages long and may contain thousands of different products.   List prices for Emerson products are not confidential, but Emerson applies discounts to its prices in project quotes.  Emerson does not apply

uniform discounts across projects, and there is no confidential formula Emerson uses to calculate quotes for a project or how low a discount Emerson will provide to any given customer.

Emerson did not require Defendant Ceasar to agree to a non-competition agreement in either of his roles with the company. In November 2024, Emerson awarded Defendant Ceasar 227 Restricted Stock Units. As part of the process of accepting the stock award, there is evidence that on December 12, 2024, Defendant Ceasar electronically accepted the Emerson Fiscal 2025-2027 Restricted Stock United Program Award Agreement ("RSU Agreement") through an online portal. The RSU Agreement contains the following language:

> That during your employment by Emerson Electric Co. or any of its divisions, subsidiaries or affiliates (collectively, "Emerson"), and for a period of one (1) year immediately after your employment with Emerson ends for any reason, including by reason of divestiture or spin-off, you will not directly or indirectly, regardless of whether any payment has been made to you under the Program, (a) compete against, or enter the employ of or assist any person, firm, corporation or other entity in a business that competes against any business of Emerson in which you were at any time employed, (b) compete against any such Emerson business by soliciting or pursuing its customers, or (c) solicit or hire any Emerson employees. Emerson shall be entitled to all rights and remedies available at law or equity for any breach or threatened breach of this Agreement, including a cancellation of this Award and any other outstanding equity awards and/or the return of all shares (including any cash payment in lieu of shares) issued under this Program or any prior program under the Plan, damages, and injunctive relief.
>
> The Program benefits Emerson employees who have access to Emerson's confidential and proprietary business plans and strategies

and Emerson's confidential and propriety business methods and customer relationships and preferences. You therefore acknowledge that by virtue of your position and responsibilities within Emerson, you have access to Emerson's highly confidential business plans and strategies, and which strategies will be implemented in the future. You also acknowledge that by virtue of your position and responsibilities within Emerson that you have access to Emerson's confidential and trade secret methods for conducting its business, as well as confidential information regarding customers and customer preferences. You further acknowledge that competitors of Emerson would obtain unfair insights into Emerson's plans, strategies, and confidential business methods should they obtain access to Emerson's plans, strategies, customer relationships, preferences, and business methodologies and that Emerson would be irreparably harmed should a competitor obtain access to this information. You further acknowledge that Emerson is a global company, competing with other global companies, regarding its products and services and customer relationships and preferences. You agree that you will not directly or indirectly for any purpose other than performance of your duties for Emerson disclose or cause the disclosure of Emerson's trade secrets or confidential and proprietary information[.]

(ECF No. 1, Ex. 1). Defendant Ceasar agreed to abide by these provisions when he accepted the terms of the RSU Agreement on December 12, 2024.

In June 2025, Defendant Ceasar applied for and was offered the position of National Business Development Manager – LNG/Marine at Endress+Hauser, which he accepted on July 16, 2025. On July 28, 2025, Defendant Ceasar resigned from his position with Emerson, and he notified the company that his last day would be August 8, 2025, although he did not indicate where he would be employed following his resignation. On July 29, 2025, Emerson sent Defendant Ceasar a letter reminding him of his post-employment obligations to Emerson and of his non-competition

obligations under the RSU Agreement.  On July 30, 2025, Emerson also emailed Defendant Ceasar a copy of the RSU Agreement.

Sometime thereafter, Emerson learned that Defendant Ceasar was going to work for Endress+Hauser.  It is undisputed that Endress+Hauser directly competes with Emerson. Endress+Hauser offers measurement instrumentation products that directly compete with the products offered by Emerson's Measurement Solutions business unit and Micro Motion, Inc.

On August 20, 2025, Emerson sent a cease-and-desist letter to Defendant Ceasar and Endress+Hauser. In response, Endress+Hauser's attorney informed Emerson that Defendant Ceasar had been hired for a role in the LNG industry, but that upon learning of his post-employment obligations to Emerson, Endress+Hauser had reassigned Defendant Ceasar to a role serving only the semiconductor and data center industries.  On August 25, 2025, Endress+Hauser provided Emerson with a job description for Defendant Ceasar's new role. The job description states that in his role with Endress+Hauser, Defendant Ceasar is to "drive growth initiatives by expanding Endress+Hauser's presence in the semiconductors and data centers markets. This role focuses on strengthening key customer relationships, specifically with Meta, Prime Controls, and Micron ….."  (ECF No. 1, Ex. 2 at 2).  It is undisputed that while at Emerson, Defendant Ceasar worked with Micron, and that he worked on at least one semiconductor project.

At the hearing, Defendant Ceasar testified that in light of the fact that he worked in the semiconductor industry and for Micron at Emerson, Endress+Hauser has further limited his role.  He testified that at Endress+Hauser he will be limited to business development in the data center industry, and that he will be working exclusively for two customers, Meta and Prime Control.  There is no evidence in the record that either Meta or Prime Control are customers of Emerson, or that Emerson has ever bid on a Meta or Prime Control project.  The parties dispute, however, the extent to which Defendant Ceasar worked in the data center industry for Emerson, if at all.

Defendant Ceasar testified that while at Emerson he neither worked in the data center industry nor participated in any sales related to a data center project. Roger Kelm, Emerson's Vice President of North America Sales for Measurement Solutions, confirmed that Defendant Ceasar had never sold measurement instrumentation in the data center industry while at Emerson.

Emerson did present evidence that Defendant Ceasar was exposed to some information about data center projects at Emerson. More specifically, in January 2025, Defendant Ceasar attended a seminar entitled "Project Pursuit Training and Strategic Account Project Review." (ECF No. 43 at 54).  During the seminar, which was over seven hours long, dozens of topics and projects were discussed, including

a data center project.  Emerson, however, did not provide evidence of the level of detail that was shared at this seminar regarding the data center project.

Emerson also points to the fact that on February 26, 2025, Defendant Ceasar may have attended an internal meeting at Emerson, and the PowerPoint presentation for this meeting, which was found in Defendant Ceasar's work email account at Emerson, identifies data centers as generating growth for power projects.  Again, Emerson provides no evidence as to the level of detail that was shared about the data center industry, and Defendant Ceasar had no recollection of even attending the meeting.

Emerson also produced an internal Emerson email dated July 10, 2025, wherein Defendant Ceasar and other managers were asked to provide updates about projects for the "funnel."  (Emerson Ex. 15).   In response, Defendant Ceasar provided updates on an LNG project.  One of the other managers on the email chain was working on data center projects.  In the email, there is no specific information about the data center projects, and Emerson does not identify what information was shared with Defendant Ceasar about the projects outside the email, if any.

Finally, Emerson points to an email dated July 18, 2025.  The email is from Defendant Ceasar's co-worker, and he provides information to Defendant Ceasar that he had obtained at an IIR conference, which was open to the public.  Attached to the email is a summary of the presentation from the conference, as well as a list

that was shared with attendees of new and upcoming projects, some of which were data center projects.

There is no evidence in the record that Defendant Ceasar took any of Emerson's property or documents with him upon his departure. And there is no evidence that during his time at Endress+Hauser, Defendant Ceasar has called upon, solicited, or pursued any customer that he worked with at Emerson. Emerson does contend that there is evidence in the record that Defendant Ceasar has used Emerson's confidential information in his new role at Endress+Hauser. Emerson points to the fact that in September 2025, Defendant Ceasar gave a presentation at Endress+Hauser titled "Project Pursuit Best Practices." Emerson also points to the fact that after he accepted a position with Endress+Hauser but before he stopped working for Emerson, Defendant Ceasar forwarded the July 18, 2025 email about the IIR conference to his personal email account.

Endress+Hauser required Defendant Ceasar to sign a letter prohibiting him from using or disclosing any confidential or proprietary information Defendant Ceasar obtained during his time at Emerson. The agreement also bars Defendant Ceasar from soliciting or providing services to any Emerson customers or projects with which Defendant Ceasar had personal involvement while at Emerson. Defendant Ceasar signed the agreement without objection, and he maintains that he has complied with its terms.

## II.    Conclusions of Law

## A. PRELIMINARY INJUNNCTION STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1342 (8th Cir. 2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). "Its "primary function ... is to preserve the *status quo* until, upon final hearing, a court may grant full, effective relief."" *Id.* (quoting *Ferry-Morse Seed Co. v. Food Corn, Inc.*, 729 F.2d 589, 593 (8th Cir. 1984)).

In determining whether to issue preliminary injunctive relief, this Court considers the following factors: (1) the probability that the movant will succeed on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between this harm and the injury that granting the injunction will inflict on the nonmovant; and (4) the public interest. *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc)).  The inquiry is "whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the *status quo* until the merits are determined." *Dataphase Systems, Inc.*, 640 F.2d at 113.

The likelihood of success is the most important factor.  *Roudachevski v. All-Am. Care Centers, Inc.*, 648 F.3d 701, 706 (8th Cir. 2011).  This factor directs courts to ask whether the party requesting a preliminary injunction has a "fair chance of

prevailing." *Planned Parenthood Minnesota, N. Dakota, S. Dakota v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (en banc). However, even when a plaintiff has a strong claim on the merits, "[f]ailure to demonstrate irreparable harm is a sufficient ground to deny a preliminary injunction." *Phyllis Schlafly Revocable Tr. v. Cori*, 924 F.3d 1004, 1009 (8th Cir. 2019) (quoted case omitted). "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). The moving party bears the burden to establish the need for injunctive relief. *Chlorine Inst., Inc. v. Soo Line R.R.*, 792 F.3d 903, 914 (8th Cir. 2015).

## B. DISCUSSION

### 1. Likelihood of success on the merits

A movant shows a likelihood of success on the merits when it demonstrates a "fair chance," not necessarily "greater than fifty percent," that it will ultimately prevail under applicable law. *Cigna Corporation*, 103 F.4th at 1343 (quoting *Heartland Acad. Cmty. Church v. Waddle*, 335 F.3d 684, 690 (8th Cir. 2003)). Upon review of the record, the Court is satisfied at this stage that Emerson has presented enough evidence to show it is likely to succeed on the merits with respect to its claim for breach of contract, but it has not shown that it is likely to succeed on a claim under the MUTSA.

### a. Breach of contract

Emerson claims Defendant Ceasar has breached the RSU Agreement and will continue to do so unless he is restrained. The RSU Agreement has a Missouri choice-of-law provision. Missouri courts will enforce non-competition agreements in limited circumstances that are "demonstratively reasonable." *Whelan Sec. Co. v. Kennebrew*, 379 S.W.3d 835, 841 (Mo. 2012). "A non-compete agreement is reasonable if it is no more restrictive than is necessary to protect the legitimate interests of the employer." *Id.* at 842 (quoted case omitted). The agreement must be narrowly tailored in terms of time and geography and must protect legitimate employer interests "beyond mere competition by a former employee." *Id.* at 841–82. Under Missouri law, "a non-compete agreement is enforceable 'only to the extent that the restrictions protect the employer's trade secrets or customer contacts.'" *Id.* at 842 (quoting *Healthcare Servs. of the Ozarks, Inc. v. Copeland*, 198 S.W.3d 604, 610 (Mo. 2006)). "The employer has the burden to prove that the non-compete agreement protects its legitimate interests in trade secrets or customer contacts and that the agreement is reasonable as to time and geographic space." *Id.*

The Court finds Emerson has met its burden of showing that Emerson and Defendant Ceasar entered into an enforceable non-competition agreement for which Defendant Ceasar received adequate consideration. The Court further finds that the RSU Agreement is designed to protect Emerson's customer contacts and trade

secrets, and that by limiting the scope of the agreement to businesses in which the former employee was employed at Emerson, it is no more restrictive than necessary to protect Emerson's legitimate interests. *Victoria's Secret Stores, Inc. v. May Dep't Stores Co.*, 157 S.W.3d 256, 260 (Mo. Ct. App. 2004); *Mid-States Paint & Chem. Co. v. Herr*, 746 S.W.2d 613, 617 (Mo. Ct. App. 1988). Finally, the Court finds that the agreement is reasonable as to time and geographic scope. *See Cigna Corporation*, 103 F.4th at 1344 (holding nationwide, two-year non-competition agreement was reasonable); *Alltype Fire Prot. Co. v. Mayfield*, 88 S.W.3d 120, 123 (Mo. Ct. App. 2002) (finding a two-year limitation on employment reasonable).

There remains an issue as to the scope of the non-competition agreement. Under its terms, the RSU Agreement precludes Defendant Ceasar from "compet[ing] against, or enter[ing] the employ of or assist[ing] any person, firm, corporation or other entity in a business that competes against any business of Emerson in which [he was] at any time employed[.]" (ECF No. 1, Ex. 1 at 3). In its Motion for Temporary Restraining Order, Emerson made plain that it was not seeking to enjoin Defendant Ceasar from working at Endress+Hauser entirely. Emerson limited its request and asked that the Court preclude Defendant Ceasar from competing in any business in which he worked for Emerson. Further, Emerson equated the term "business" with industries, and it asserted that it was only seeking "to enjoin [Defendant Ceasar] from engaging in activity that involves the same industries and

customers he serviced for Emerson." (ECF No. 5 at 10).   Emerson listed the industries in which Defendant Ceasar worked for Emerson as follows: "liquified natural gas (LNG), chemical, paper processing, refining, semiconductors and data centers, upstream (i.e. the exploration, drilling, and extraction of oil), brownfield decarbonization, metals and mining, alternative fuel, hydrogen, life sciences, and renewable plastics." (ECF No. 4 at 1-2).  The Court granted Emerson's Motion for Temporary Restraining Order and prohibited Defendant Ceasar from competing in these industries.

It is now undisputed, however, that during his time at Emerson, Defendant Ceasar did not work in or service the data center industry.  In fact, Emerson admits Defendant Ceasar has never been involved in sales for data center projects.  (ECF No. 43 at 156).   But in moving for the entry of a preliminary injunction, Emerson continues to ask for the same restraining order that the Court entered when it granted Emerson's Motion for Temporary Restraining Order – that Defendant Ceasar be precluded from working for Endress+Hauser in the above listed industries, including the data center industry.  Although not explicitly stated, Emerson is asking the Court to expand the terms of the RSU Agreement.

"It is the most basic principle of contract law that parties are bound by the terms of the contracts they sign and courts will enforce contracts according to their plain meaning...." *Lehman v. Auto. Invs., LLC*, 608 S.W.3d 733, 738 (Mo. Ct. App.

2020) (quoted case omitted).  The RSU Agreement prohibits Defendant Ceasar from competing against Emerson "in a business that competes against any business of Emerson in which [he was] at any time employed[.]" (ECF No. 1, Ex. 1 at 3).  In other words, in exchange for stock options that would vest three years in the future, Emerson received Defendant Ceasar's promise that he would not compete against Emerson in a business in which he was employed at Emerson.

The record shows that Defendant Ceasar worked in many industries for Emerson, but not in the data center industry.  The Court finds that under the terms of RSU Agreement, Defendant Ceasar is not precluded from working for Endress+Hauser in the data center industry.  It would be a breach of the RSU Agreement should Defendant Ceasar engage in work at Endress+Hauser that involves the same industries and customers that he serviced for Emerson.

### b.  The MUTSA

Emerson also moves that the Court enter a preliminary injunction precluding Defendant Ceasar from working for Endress+Hauser based on its claim under the MUTSA.  To establish a violation of the MUTSA, a plaintiff must demonstrate "(1) the existence of a protectable trade secret, (2) misappropriation of those trade secrets by Defendants, and (3) damages." *Secure Energy, Inc. v. Coal Synthetics, LLC*, 708 F. Supp. 2d 923, 926 (E.D. Mo. 2010). *See also Cent. Tr. & Inv. Co. v. Signalpoint Asset Mgmt., LLC*, 422 S.W.3d 312, 320 (Mo. 2014).

Missouri law defines a trade secret as:

> information, including but not limited to, technical or nontechnical data, a formula, pattern, compilation, program, device, method, technique, or process, that: (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Mo. Rev. Stat. § 417.453(4)

Under the MUSTA, a misappropriation occurs: "(1) when a person acquires the trade secret while knowing or having reason to know that he or she is doing so by improper means, (2) when a person who has acquired or derived knowledge of the trade secret discloses it without the owner's consent, or (3) when a person who has acquired or derived knowledge of the trade secret uses it without the owner's consent." *Central Trust and Inv. Co.*, 422 S.W.3d at 322.

Emerson contends Defendant Cesear has misappropriated its trade secrets. In support of this contention, Emerson points to the presentation Defendant Ceasar gave to Endress+Hauser employees titled "Project Pursuit Best Practices." Emerson claims this presentation contains its trade secrets. At the hearing, Defendant Ceasar testified that the presentation was 30 minutes long and that it was a very general overview of sales strategies for successful project pursuit. He further testified that it was based on knowledge that he has gained in his 20 years in sales at Emerson and at other companies.

The Court has reviewed the presentation materials and considered Defendant Ceasar's testimony, and it finds that Emerson has not shown that Defendant Ceasar disclosed any trade secrets during this presentation. The written presentation materials are very general and contain no specific information regarding Emerson. Together with the written materials, the Court finds credible Defendant Ceasar's testimony that the presentation was a very general overview of good sales practices, and he shared no confidential information about Emerson let alone trade secrets. Under Missouri law, "[t]he normal skills of a trade are not included in an employer's protectable interest. Thus, the basic skill of a craftsman will not support a restrictive covenant." *Schmersahl, Treloar & Co., P.C. v. McHugh*, 28 S.W.3d 345, 350 (Mo. Ct. App. 2000). There is no evidence that Defendant Ceasar disclosed Emerson's trade secrets during this presentation.

Emerson also points to the email that Defendant Ceasar received from his co-worker that he forwarded to his personal email account while he was still employed at Emerson but after he had accepted a position at Endress+Hauser. Defendant Ceasar testified that this email contained information that his co-worker had obtained at an industry conference, and that the conference was open to the public. Defendant Ceasar further testified that he forwarded the email to his personal email account so that he could review it while he was attending his daughter's game. Emerson did not rebut this testimony.

17

The Court has reviewed the email and finds Defendant Ceasar's testimony is credible. Emerson has not shown that the email contained its trade secrets, let alone that Defendant Ceasar disclosed them. In sum, the Court finds Emerson has not presented sufficient evidence to show it is likely that Defendant Ceasar misappropriated its trade secrets within the meaning of the MUTSA.

Alternatively, Emerson argues that it is inevitable that Defendant Ceasar will misappropriate its trade secrets if he continues to work for Endress+Hauser. "Courts refer to this future-misappropriation theory as the 'inevitable-disclosure doctrine' and repeatedly emphasize that it poses a high bar." *Best Foot Forward Corp. v. Basso*, No. 4:23-CV-1246 HEA, 2023 WL 7128423, at *4 (E.D. Mo. Oct. 30, 2023) (quoting *Prime Therapeutics LLC v. Beatty*, 354 F. Supp. 3d 957, 969 (D. Minn. 2018)). Neither the Eighth Circuit nor Missouri's state courts have endorsed the inevitable disclosure doctrine under the MUTSA. *MiTek Inc. v. McIntosh*, No. 4:23-CV-960 RLW, 2023 WL 5846714, at *6 (E.D. Mo. Sept. 11, 2023); *Schenck Process LLC v. Zeppelin Sys. USA, Inc.*, No. 18-00470-CV-W-ODS, 2018 WL 4279223, at *2 (W.D. Mo. June 25, 2018); *Panera, LLC v. Nettles*, No. 4:16-CV-1181 JAR, 2016 WL 4124114, at *4 (E.D. Mo. Aug. 3, 2016). "[T]he issue remains open for the Missouri courts to decide." *Leggett & Platt, Inc. v. Hollywood Bed & Spring Mfg. Co.*, No. 20-05010-CV-S-BP, 2020 WL 13580657, at *8 (W.D. Mo. May 15, 2020). The Court, therefore, declines to apply the doctrine here.

But even if the doctrine of inevitable disclosure were recognized under controlling law interpreting the MUSTA, Emerson has not demonstrated that it would apply under the facts of this case. As discussed above, Emerson has shown that it is likely to succeed on the merits of its breach of contract claim. Under the terms of the non-competition agreement, Defendant Ceasar is precluded from engaging in work at Endress+Hauser that involves the same industries and customers that he serviced for Emerson. Therefore, the issue before the Court is whether it is likely that Defendant Ceasar will inevitably disclose Emerson's trade secrets were he to work for Endress+Hauser in industries that he did not service at Emerson, and more specifically the data center industry. The Court finds Defendant has not made such a showing.

In support of its argument that an injunction should continue to cover the data center industry, Emerson points to the fact that during Defendant Ceasar's employment at Emerson, his role was never limited to specific industries, but rather he worked on the pursuit of projects across industries, and the focus would shift based on market demand. Defendant Ceasar's focus may have shifted to align with demands in the market, but there is no evidence that he ever did work for Emerson on data centers. And any information that he was exposed to about Emerson's work in the data center industry appears to have been very general.

Emerson further argues that during his employment, Defendant Cesear was exposed to confidential information regarding all of Emerson's measurement instrumentation business, which included information and strategies that would be applicable to the data center industry.  Roger Kelm, the Vice President of North America Sales for Measure Solutions at Emerson and Defendant Ceasar's former boss, testified that Defendant Ceasar has learned "how we think about things, what our processes are, what our strategy is for those projects." (ECF No. 43 at 142).  He further testified, "[Defendant Ceasar] knows my discount level, he knows discount levels of people above me or around – just below me, so you could use that information to gauge where we are going to bid something." *Id.*  Finally, Emerson argues that the measurement instrumentation products that Endress+Hauser sells to data centers are directly competitive with products Emerson sells to data centers, and Defendant Ceasar sold those products in other industries while he was employed at Emerson.

Defendant Ceasar responds that the undisputed evidence shows that he did not take any trade secrets with him when he left Emerson, and that it would be impossible to commit to memory Emerson's confidential business and financial records and all the products that Emerson sells and the prices for which they are sold. Defendant Ceasar also points to the fact that Emerson does not have a uniform discount formula it applies to all projects, but rather each project is different, and

bids on projects are based on numerous factors, including the specifications and scope of the project, the customer's needs, and relationships with the customer. In short, Defendant Ceasar argues that he lacks the ability to predict Emerson's pricing for data center projects, an industry in which he was not involved. The Court finds Defendant Ceasar's argument to be persuasive.

Defendant Ceasar also argues that there is little risk that he would share trade secrets because he will be working for customers that he has never serviced, and in fact, the two customers have never been customers of Emerson. The Court agrees that there is no evidence that Emerson has ever submitted a bid for Meta or Prime Control, the two customers to which he will be assigned at Endress+Hauser. Further, there is evidence in the record that quotes for projects are often based, in part, on relationship with the customer. Defendant Ceasar would have no inside information about these two companies from his work at Emerson.

In light of the fact that Defendant Ceasar will be servicing two established customers for Endress+Hauser in an industry in which he has never worked, and there is no evidence that Emerson has ever bid on projects for these two customers or that it intends to do so, Emerson has not shown that Defendant Ceasar will inevitably use Emerson's trade secrets at Endress+Hauser in the role he has been assigned. Based on the record before it, the Court finds Emerson has failed to

demonstrate Defendant Ceasar misappropriated trade secrets in violation of the MUTSA or that he is likely to do so.

The Court now turns to the remaining three *Dataphase* factors

## 2. Irreparable Harm

Emerson has sufficiently shown it will suffer irreparable harm if a limited preliminary injunction is not granted. Under Missouri law, breach of a non-competition agreement typically amounts to a *per se* irreparable injury. *Osage Glass, Inc. v. Donovan*, 693 S.W.2d 71, 74–75 (Mo. 1985); *see also*, *N.I.S. Corp. v. Swindle*, 724 F.2d 707, 710 (8th Cir. 1984); *Express Scripts, Inc. v. Lavin*, No. 4:17-CV-1423 HEA, 2017 WL 2903205, at *8 (E.D. Mo. July 7, 2017) ("The mere violation of a valid non-compete agreement can support an inference of the existence of a threat of irreparable harm."); *H & R Block Tax Servs. LLC v. Haworth*, No. 4:15-CV-211 SRB, 2015 WL 5601940, at *4 (W.D. Mo. Sept. 22, 2015) ("Defendant is competing against Plaintiff for its current and prospective clients. Monetary relief will not adequately protect Plaintiff's interest in these relationships, and it cannot fully remedy Plaintiff's loss of good will, confidential information, and other legitimate business advantage."). Moreover, under Missouri law, an employer need only demonstrate there is a threat of irreparable harm; the employer is not required to demonstrate actual damage has occurred. *See Osage Glass, Inc.*, 693 S.W.2d at 75*; see also Emerson Elec. Co. v. Rogers*, 418 F.3d 841, 846 (8th Cir. 2005) (finding

the threat of the sales personnel luring away [former employer]'s customers met the irreparable harm requirement because it "would be difficult to measure the amount of damages caused by the unfair competition and impossible to remedy fully because the consumers could not be forced to purchase [the plaintiff]'s products."); *Systematic Bus. Servs., Inc. v. Bratten*, 162 S.W.3d 41, 51 (Mo. Ct. App. 2005) (where the restrictive covenant is valid and the former employee has an opportunity to influence her former employer's customers, actual damages are not necessary to obtain permanent injunctive relief). Threatened disclosure of "confidential information such as business strategy" results in irreparable harm, making a "remedy at law …. inadequate, because [the plaintiff's] damages would be difficult if not impossible to measure." *Panera, LLC*, 2016 WL 4124114, at *4-5. Indeed, "[c]ourts generally hold that the disclosure of confidential information such as customer information and business strategy will result in irreparable harm to the plaintiff." *Experitec, Inc. v. Stachowski*, No. 4:14-CV-154 AGF, 2014 WL 11089362, at *3 (E.D. Mo. Jan. 30, 2014).

The Court finds that were Defendant Ceasar to work for Endress+Hauser servicing customers and industries that he serviced for Emerson and thereby breaching his non-competition obligations under the RSU Agreement, it would present a clear risk of irreparable harm to Emerson. In addition to being extremely difficult to measure, money damages alone would be inadequate to remedy

violations of the non-competition agreement. The Court finds that Cigna has established the likelihood of irreparable harm with no adequate remedy at law in the absence of an injunction precluding Defendant Ceasar from working at Endress+Hauser in industries in which he worked at Emerson.

### 3. Balance of harms

The Court finds that the equities favor granting Emerson's request for injunctive relief. Defendant Ceasar possesses information that could be used for the purpose of causing irreparable harm to Emerson in the form of lost customers and contracts, disclosure of sensitive business information, and a diminished competitive position in the industries in which he worked.

This threatened injury outweighs any damage Defendant Ceasar might experience as a result of the requested preliminary injunction. In contrast to the potential harm Emerson would face, Defendant Ceasar will suffer little appreciable harm if enjoined. While Defendant Ceasar will be limited for one year in the roles he can take at Endress+Hauser, he may continue to work in a position that does not violate the terms of the RSU Agreement. Furthermore, Defendant Ceasar agreed to the terms of the RSU Agreement and, thus, any damage he might incur was created by his own action in breaching the agreement. *See Emerson Elec. Co.*, 418 F.3d at 846 ("[Defendant] knowingly and voluntarily agreed to be restricted by the covenant, and any perceived harm to him by the enforcement of the agreement is

outweighed by the harm foreseeable to [Plaintiff].”); *H&R Block Tax Servs. LLC v. Frias*, No. 4:18-CV-53 RAK, 2018 WL 934901, at *4 (W.D. Mo. Feb. 16, 2018) (“Having accepted significant financial and other benefits from his agreements with H&R Block, Defendant should not now be relieved from his own obligations.”).  In sum, the Court finds that the balance of equities weighs in favor of granting Emerson injunctive relief.

### 4.  The public interest

Courts in Missouri have held that the enforcement of reasonable restrictive covenants serves the public interest. *See Schott v. Beussink*, 950 S.W.2d 621, 625 (Mo. Ct. App. 1997) (“Missouri courts recognize that public policy approves employment contracts containing restrictive covenants because the employer has a proprietary right in its stock of customers and their good will, and if the covenant is otherwise reasonable, the court will protect the asset against appropriation by an employee.”); *see also Haines v. VeriMed Healthcare Network, LLC*, 613 F. Supp. 2d 1133, 1137 (E.D. Mo. 2009) (“The recognized benefits of reasonably enforced restrictive covenants are now beyond question.”). More generally, Missouri courts recognize the public interest in enforcing all contracts. *See H&R Block Tax Servs., LLC v. Cardenas*, No. 4:20-CV-109 SRB, 2020 WL 1031033, at *4 (W.D. Mo. Mar. 3, 2020).  Here, entry of a preliminary injunction will promote the public interest,

including promoting freedom of contract and the enforcement of contracts between parties.

### III.    *Conclusion*

Upon careful consideration of the evidentiary record in this case and applying the *Dataphase* factors, the Court will grant in part Emerson's motion for a preliminary injunction against Defendant Ceasar based on Emerson's claim for breach of contract.  Emerson will be precluded from working for Endress+Hauser in activities that involve the customers and industries that he serviced for Emerson.

Accordingly,

**IT IS HEREBY ORDERED** that consistent with the terms of this Opinion, Memorandum and Order, Plaintiff Emerson Electric Co.'s Motion for Preliminary Injunction against Defendant Jacob Ceaser is **GRANTED in part and denied in part**. (ECF No. 32).  The motion is **GRANTED** in that during the period of one (1) year following August 8, 2025, Jacob Ceaser is prohibited from directly or indirectly, alone or in concert with others from:

(1) Acting, directly or indirectly – whether as an owner, employee, consultant, independent contractor or any other role – in any capacity with a company that directly competes with Emerson, including Endress+Hauser, by selling or supporting the sale of measurement instrumentation in the following industries: liquified natural gas (LNG), chemical, paper

processing, refining, semiconductors, upstream (i.e. the exploration, drilling, and extraction of oil), brownfield decarbonization, metals and mining, alternative fuel, hydrogen, life sciences, and renewable plastics;

(2) Divulging, revealing, or otherwise disclosing to Endress+Hauser or any of its entities, or any other person or entity, Emerson's trade secrets or confidential information.

(3) Calling upon, soliciting, diverting, attempting to call upon, solicit, or divert (or assist in any of the foregoing), or accept business from/do business with any customer/potential customer of Emerson that was a customer/potential customer Defendant Jacob Ceasar serviced during his employment with Emerson.

In all other respects, Plaintiff Emerson Electric Co.'s Motion for Preliminary Injunction is **DENIED.**

**IT IS FURTHER ORDERED** that the Seventy-Five Thousand Dollars ($75,000) surety bond Plaintiff Emerson Electric Co. posted with the Clerk of Court on October 3, 2025, shall remain as security pursuant to Fed. R. Civ. P. 65(c).

Dated this 20th day of November, 2025.

_____

HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE